# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

**SHIRLEY CONWAY,**

Plaintiff,

vs.

**NORTHFIELD INSURANCE COMPANY,**

Defendant.

CASE NO. 18-cv-06407-YGR

**ORDER GRANTING CONWAY'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING NORTHFIELD'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 19

The Court considers herein cross motions for summary judgment by plaintiff Shirley Conway ("Conway") and defendant Northfield Insurance Company ("Northfield") regarding the latter's duty to defend in an underlying landlord-tenant action. (Dkt. Nos. 18, 19.) The Court heard oral argument on the motions on April 30, 2019.

Having considered the parties' written and oral arguments, and the admissible evidence submitted, and for the reasons set forth herein, the Court **ORDERS** as follows: (1) Conway's motion for partial summary judgment is **GRANTED**, and (2) Northfield's cross-motion for summary judgment is **DENIED**. The Court finds that the undisputed material facts show that there is a potential for coverage under the insurance policies at issue for claims raised in the underlying litigation. More specifically, the underlying action involves potential claims arising under Coverage A and Coverage B, and no relevant exclusions apply. Accordingly, Northfield has a duty to defend.

I. **SUMMARY OF FACTS**

A. **The Underlying Action**

The instant complaint stems from a coverage dispute related to an action filed in the Superior Court for the State of California, County of San Francisco, captioned *Supmitchotima v. Conway*, Case No. CGC-18-564336. The complaint in the underlying action, filed February 14, 2018, concerns a property owned by Conway located at 3295 Mission Street in San Francisco. (Joint Appendix of Exhibits ("JA"), Ex. A ("Compl.") ¶¶ 6-7.) That complaint alleges, in pertinent part, as follows:

- In January 2009, plaintiff Ratinun Supmitchotima assumed liability under an existing lease for the property, which had been used to operate a restaurant called Pad Thai. (*Id.* ¶ 6.) Beginning in 2009 and continuing throughout the relevant period, Conway repeatedly told Supmitchotima that Conway would sell the building to plaintiff. (*Id.* ¶ 8.) In reliance on these representations, Supmitchotima executed a new lease for the property in 2014. (*Id.* ¶¶ 9-10.) The lease not only concerned the commercial space, but included use of a residential space on the second floor by Supmitchotima and her family. (*Id.* ¶ 10.)

- As to the residential space, Conway failed to disclose that the second floor of the building was not a legal residential unit, but rather, was zoned for "commercial" use, and never sought to convert the residential space into a legal residential unit. (*Id.* ¶ 11.) Moreover, the San Francisco Building Department never issued a certificate of occupancy permitting any portion of the building to be used as a residence. (*Id.*) Numerous problems affected the residential unit, including a leaky roof, mold, inadequate ventilation, and power outages, which rendered the residential space unsafe for occupancy. (*Id.* ¶¶ 13, 52.)

- Next, the building required significant repair work that interfered with Supmitchotima's operation of the restaurant. (*Id.* ¶ 13.) Specifically, the foundation of the building had structural problems requiring extensive repair work, including work on the bathrooms in the restaurant. (*Id.*) Conway failed to instruct her contractor to attempt to perform repair work outside restaurant hours. (*Id.*) As a result, Supmitchotima was forced to close the restaurant for several weeks in the spring of 2016. (*Id.*) The repair work and consequent

2

closures of the restaurant resulted in Supmitchotima losing five restaurant employees.  (*Id.* ¶ 16.)  Conway also placed construction signs in front of the restaurant and did not remove them until November 2016, even though no construction vehicles were using the space for at least a portion of that time.  (*Id.* ¶ 47.)

- In 2017, Conway's attorney sent notices to Supmitchotima stating that the 2015 lease was in default because of Supmitchotima's supposed failure to secure proper liability and property insurance.  (*Id.* ¶ 17.)  Conway's attorney threatened to evict Supmitchotima and her family.  (*Id.*)

- Due to the disruption caused to the restaurant by the repair work, and Conway's demands that Supmitchotima fund the repairs herself, Supmitchotima had to close her business after nine years of operation.  (*Id.* ¶ 19.)

The complaint includes claims for, among other things, tortious interference with prospective economic relations and contract, breach of contract, negligence, and fraud.  (*Id.* ¶¶ 22-74.)

On June 15, 2018, Conway filed a cross-complaint in the underlying action seeking, among other things, to have Supmitchotima removed from the property.  (JA, Ex. F ("Cross-Compl.") ¶¶ 43-44.)  The cross-complaint alleges that Supmitchotima told Conway that she had obtained all necessary permits to install a kitchen and bathroom on the property and had certified the residential space for use as a dwelling, all of which was false.  (*Id.* ¶ 7.)  The cross-complaint further alleges that Supmitchotima hired unlicensed individuals to perform repairs on the property without Conway's consent.  (*Id.* ¶ 9.)[1]

---

[1]  Federal Rule of Evidence 201 provides that the Court may judicially notice a fact that is not subject to reasonable dispute where it "is generally known within the court's territorial jurisdiction; or can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."  Fed.R.Evid. 201(b)(1)-(2).  The Court may take judicial notice of undisputed matters of public record, *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), including documents on file in state courts.  *See Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002).

Northfield requests judicial notice of six documents: (1) Conway's answer to the tenant's complaint in the underlying action; (2) the tenant's answer in the unlawful detainer action filed by Conway, which was consolidated with the underlying action; (3) a statement of business information regarding Pad Thai Restaurant, which was filed with the California Secretary of State in 2009; (4) business registration information for Pad Thai Restaurant; (5) "fictious business

**B.     The Policies**

Northfield issued two successive commercial general liability policies to Conway, with effective policy periods of August 26, 2016 through August 26, 2017, and August 26, 2017 through August 26, 2018.  (JA, Exs. D and E (collectively, the "Policies").)[2]

"Coverage A" of the Policies provides coverage for "bodily injury and property damage liability."  (JA, Ex. D at 21; JA, Ex. E at 21.)[3]  "Property damage," as defined in the Policies, includes "loss of use of tangible property that is not physically injured."  (JA, Ex. D at 51; JA, Ex. E at 51.)  The Policies provide that any such loss of use "shall be deemed to occur at the time of the 'occurrence' that caused it."  (JA, Ex. D at 51; JA, Ex. E at 51.)  "Occurrence," in turn, is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (JA, Ex. D at 34; JA, Ex. E at 34.)

"Coverage B" provides coverage for "personal and advertising injury liability."  (JA, Ex. D at 25; JA, Ex. E at 25.)  "Personal and advertising injury" is defined in the Policies as any injury, other than bodily injury, that arises out of, among other things, "[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling[,] or premises that a person occupies, committed by or on behalf of its owner, landlord[,] or lessor."  (JA, Ex. D at 34; JA, Ex. E at 34.)

In relevant part, the Policies contain the following exclusions from coverage:

_____

name" records for Pad Thai Restaurant, filed with the city of San Francisco; and (6) copies of the American Heritage and Black's Law Dictionary definitions of "habitable."  (Dkt. Nos. 19-2, 21-1.)  Conway does not oppose Northfield's requests.

The Court **GRANTS** Northfield's request for judicial notice as to (1) the tenant's answer to Conway's complaint in the unlawful detainer action, which is a public record whose accuracy cannot be reasonably questioned; and (2) the dictionary definitions, which the Court may consider when determining the "plain, unambiguous, and common meanings of terms," *Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 859 F. Supp. 2d 1138, 1145 (E.D. Cal. 2012).  As set forth herein, all other requests for judicial notice are not necessary to the Court's decision and, as such, are **DENIED** as moot.

[2] Northfield contends, and Conway does not dispute, that the policies are materially identical.

[3] Citations to page numbers in the Policies refer to ECF pages.

4

**Habitability of Premises**

"Bodily injury" or "property damage" . . . [or] "Personal and advertising injury":

(1)      Arising out of the:

    (a)     Actual or alleged violation of any federal, state or local law, code, regulation, ordinance or rule relating to the habitability of any premises;

    (b)     Breach of any lease, rental agreement, warranty or covenant to maintain a premises in a habitable condition; or

    (c)     Wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling or premises, whether actual or constructive, due to failure to maintain a premises in a habitable condition;

(2)      Alleged in any claim or "suit" that also alleges any violation, breach or wrongful eviction, entry or invasion as set forth in Paragraphs **(1) (a) - (c)** above.

(JA, Ex. D at 68; JA, Ex. E at 68.)

**Independent Contractors**

"Bodily injury," [] "property damage" . . . [or] "[p]ersonal and advertising injury" arising out of the operations of any independent contractor performed for or on behalf of any insured.

(JA, Ex. D at 42; JA, Ex. E at 42.)

The Policies also exclude from coverage "[p]roperty damage" to "[p]roperty [the insured] own[s], rent[s], or occup[ies]," as well as "[p]roperty damage" to "[t]hat particular part of real property on which you or any contractors or subcontractors working . . . on your behalf are performing operations[.]"  (JA, Ex. D at 24; JA, Ex. E at 24.)

II.    APPLICABLE STANDARDS

A.    **Summary Judgment**

The parties each have filed motions for summary judgment on the issue of whether Northfield has a duty to defend Conway.  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (alteration and internal quotation marks omitted).  Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each

side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id*. (quoting

Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2720, at 335-36 (3d ed. 1998)).  If, however,

the cross-motions are before the court at the same time, the court must consider the evidence

proffered by both sets of motions before ruling on either one. *Riverside Two*, 249 F.3d at 1135-36.

### B. Duty to Defend

An "insurer has a duty to defend an insured if it becomes aware of, or if [a] third party

lawsuit pleads, facts giving rise to the potential for coverage under the insuring

agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 19 (1995), *as modified on denial of*

*reh'g* (Oct. 26, 1995) (internal citations omitted).  Under well-established California law, "the

duty to defend is broader than the duty to indemnify." *Montrose Chem. Corp. v. Superior Court*,

6 Cal.4th 287, 299-300 (1993) (*Montrose I*); *see also Hartford Cas. Ins. Co. v. Swift Distribution,*

*Inc.*, 59 Cal.4th 277, 287 (2014) (duty to defend interpreted broadly).  "If any facts stated in or

fairly inferable from the complaint, or otherwise known or discovered by the insurer, suggest a

claim potentially covered by the policy, the insurer's duty to defend arises." *Albert v. Truck Ins.*

*Exch.*, 23 Cal.App.5th 367, 377-78 (2018) *quoting McMillin Management Services, L.P. v.*

*Financial Pacific Ins. Co.*, 17 Cal.App.5th 187, 191 (2017).

"Any doubt as to whether the facts establish the existence of the defense duty must be

resolved in the insured's favor." *Montrose I*, 59 Cal.4th at 287; *see also Hartford Casualty*, 59

Cal.4th at 287 (same).  The insured need only show a mere possibility of coverage under the

policy to establish a duty to defend, while an insurer is entitled to summary judgment only upon a

showing that no potential for coverage exists under the policy as a matter of law. *Regional Steel*

*Corp. v. Liberty Surplus Ins. Corp.*, 226 Cal.App.4th 1377, 1389 (2014); *see also County of San*

*Diego v. Ace Property & Casualty Ins. Co.*, 37 Cal.4th 406, 414 (2005) ("*Ace Property*");

*Montrose I*, 6 Cal.4th at 300; *Gray v. Zurich Ins. Co.* 65 Cal.2d 263, 275 (1966).  In other words,

if the third-party complaint could not raise a single issue that would bring it within the policy's

coverage under any conceivable theory, the insurer need not defend. *Gray*, 65 Cal.2d at 276, n.15;

*see also Hyundai Motor Am. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 600 F.3d 1092, 1097

(9th Cir. 2010) (obligation to defend excused only when the complaint does not raise, by any conceivable theory, a single issue which could bring it within the policy coverage).

"The duty to defend is determined by reference to the policy, the complaint, and *all* facts known to the insurer from any source." *Montrose I*, 6 Cal.4th at 300 (emphasis in original). "The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." *Id.* "Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." *Id.* at 295 (*quoting Gray*, 65 Cal.2d at 276). "An insurer that has issued an insurance policy that includes a duty to defend must defend any legal action brought against an insured that is based in whole or in part on any allegations that, if proved, would be covered by the policy, without regard to the merits of those allegations." RESTATEMENT OF THE LAW OF LIABILITY INSURANCE § 13 (June 2019 Update). "For the purpose of determining whether an insurer must defend, the legal action is deemed to be based on: (a) Any allegation contained in the complaint or comparable document stating the legal action; and (b) Any additional allegation known to the insurer, not contained in the complaint or comparable document stating the legal action, that a reasonable insurer would regard as an actual or potential basis for all or part of the action." *Id.*

"An insurer may rely on an exclusion to deny coverage only if it provides conclusive evidence demonstrating that the exclusion applies." *Atlantic Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1038-1039 (2002). However, in determining whether a particular policy provides a potential for coverage, the Court is guided by the principle that interpretation of an insurance policy is a question of law. *Ace Property*, 37 Cal.4th at 414 (citing cases).

## III. DISCUSSION

In ruling on the cross-motions, the Court must determine whether the underlying action raises any potential claims that are covered under the Policies. Conway contends that two provisions in the Policies apply, namely, those providing coverage for "bodily injury and property damage" and "personal and advertising injury." Northfield argues that neither provision applies, and even if they do, Northfield is excused from its duty to defend due to exclusions in the Policies.

The Court considers each relevant provision in turn.

**A.** **Bodily Injury and Property Damage: Loss of Use of Tangible Property Not Physically Damaged (Coverage A)**

In this section, the Court addresses whether the complaint alleges (i) a "loss of use of tangible property," which constituted (2) an "occurrence" under the Policies (3) during the relevant policy periods.

*1.* *Loss of Use of Tangible Property*

Under the "bodily injury and property damage" provision of the Policies (Coverage A), Northfield has a duty to defend Conway in any action for "loss of use of tangible property of others that is not physically damaged." (JA, Ex. D at 21; JA, Ex. E at 21.) Conway asserts two theories under which the underlying action potentially alleges "loss of use of tangible property": (1) the complaint alleges that Supmitchotima was unable use the premises as a restaurant due to Conway's conduct, and (2) the complaint alleges that Supmitchotima was unable to use her own property, including equipment, fixtures, tables, and chairs, in the operation of the restaurant, due to Conway's conduct. (Dkt. No. 18-1 ("Conway Motion") at 13.)

As to the first theory, California courts have been somewhat inconsistent in their approach to whether loss of use of a leasehold interest, as would be the case here, constitutes "loss of use of tangible property." For the negative proposition, that is, loss of use of a leasehold interest is *not* "loss of use of tangible property," Northfield relies on *Golden Eagle Ins. Corp. v. Cen-Fed, Ltd.*, 148 Cal. App. 4th 976 (2007). There, the California Court of Appeal, Second District, found that a bank's claim that it was deprived of use of leased space due to its landlord's failure to maintain and repair the premises "rested *entirely on [the landlord]'s alleged breach of the lease and the resulting economic damage* . . . that is, a loss of rental *income* and loss of *use* of leased space[.]" *Id.* at 987 (emphasis in original). The *Golden Eagle* court held that "strictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property[.]" *Id.* at 987 (quoting *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 17 (1995)). The court further held that the bank's "leasehold interests were not tangible property." *Id.*

More recently, the California Court of Appeal, Fourth District, has called into question the holding of *Golden Eagle*. In *Thee Sombrero, Inc. v. Scottsdale Ins. Co.*, 28 Cal. App. 5th 729, 733-34 (Ct. App. 2018), a property owner alleged that due to its security company's negligence, a fatal shooting occurred on the property, which in turn caused the property owner's permit to be revoked. There, the court observed that the *Golden Eagle* court "did not cite any authority" for the proposition that a leasehold interest was not tangible property and "questioned whether the proposition was valid." *Id.* at 742. The court noted that "a lease is . . . a conveyance of an estate in real property. . . . A building is tangible. Dirt is tangible. Hence, a lessee in possession has a tangible property interest in the leased premises." *Id.* at 738 (internal citations and quotations omitted.) Ultimately, however, the court noted that "anything [it] ha[d] to say on the point [wa]s dictum" because in the case before it, the plaintiff owned, rather than leased, the property at issue. *Id.* at 742.

Although this Court acknowledges the common-sense approach of *Thee Sombrero*, because that court's view of *Golden Eagle* was expressed in dictum, it does not carry precedential value. *See Areso v. CarMax, Inc.*, 195 Cal. App. 4th 996, 1006 (2011) (holding that observations by a court are dicta and not precedent); *see also Thee Sombrero*, 28 Cal. App. 5th at 742 ("[W]e may accept, for purposes of argument, that in *Golden Eagle*, [the] claim for the diminution in value of its leasehold interest was a claim for economic loss, untethered to an interest in tangible property."). Absent contrary authority from a higher court, *Golden Eagle*'s holding that leaseholds do not constitute tangible property remains the current state of the law and Northfield is allowed to rely upon it. Thus, given that precedent, the underlying action does not raise a potential claim for "loss of use of tangible property" arising out of Supmitchotima's inability to use the restaurant premises.

Conway's next theory is that the underlying action involves a potential claim for loss of use of Supmitchotima's own property, including equipment, fixtures, tables, and chairs, in the operation of the restaurant. In support of this argument, Conway relies on *Riverbank v. N.H. Ins. Co.*, 2012 WL 2119046 (E.D. Cal. 2012). (Dkt. No. 20 ("Conway Reply") at 3-4.) In *Riverbank*, the court found that while a loss of use of a leasehold may not be tangible property under *Golden*

9

United States District Court
Northern District of California

*Eagle*, "the loss of use of [a] *tenant improvement* is." *Riverbank*, 2012 WL 2119046, at *8 (emphasis supplied). There, the court found potential loss of use of restaurant assets based on "a possible and natural interpretation" of the complaint, as well as a list of restaurant equipment and a spreadsheet identifying claimed damages to the restaurant's kitchen. *Id*. at *6. Northfield argues that here, unlike *Riverbank*, there are no allegations in the complaint regarding restaurant equipment or Supmitchotima's other property that could support this argument. (Dkt. No 21 ("Northfield Reply") at 2-3.)

The Court disagrees. Although there is less evidence of damage to Supmitchotima's property as compared to the evidence in *Riverbank*, the pleadings in the underlying action support a finding that Supmitchotima brought a potential claim for such damage. Specifically, the complaint alleges that when Supmitchotima took over the lease from the prior tenant, she "purchased the restaurant assets." (Compl. ¶ 6.) Moreover, the cross-complaint alleges that Supmitchotima told Conway that she had obtained all necessary permits to install a kitchen and bathroom on the property, when in fact she had not. (Cross-Compl. ¶ 7.) While it is unclear whether the kitchen and bathroom were constructed in the commercial or residential space, it is at least possible that Supmitchotima made these "improvements" to the restaurant premises. Supmitchotima further alleges that she was forced to close the restaurant due to Conway's actions, which would have rendered her unable to use these restaurant assets. Construing these allegations in the manner most favorable to Conway, and in light of the *Riverbank* authority, the underlying action raises a potential claim for loss of use of restaurant assets owned by Supmitchotima, which triggers Northfield's duty to defend.

### 2. An "Occurrence"

Under the Policies, Northfield owes a duty to defend a potential claim for "loss of use of tangible property" only if the loss is caused by an "occurrence." (JA, Ex. D at 51; JA, Ex. E at 51.) Thus, the Court must next consider whether any loss of use of restaurant assets potentially was caused by an "occurrence," which is defined in the Policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (JA, Ex. D at 34; JA, Ex. E at 34.)

The California Supreme Court has defined "accident," in the context of insurance liability, as "an unexpected, unforeseen, or undersigned happening or consequence from either a known or unknown cause." *Delgado v. Interinsurance Exch. of the Auto. Club of S. Calif.*, 47 Cal. 4th 302, 308-09 (2009) (citations omitted). Critically, "[u]nder California law, the word 'accident' in the coverage clause of a liability policy refers to the **conduct of the insured** for which liability is sought to be imposed . . . ." *Id.* at 311 (emphasis supplied). "[A]n accident exists when any aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity." *Merced Mutual Ins. Co. v. Mendez*, 213 Cal. App. 3d 41, 49 (1989).

Here, Northfield argues that the actions of Conway's contractors, which gave rise to the alleged damage, were deliberate, and that there were no allegations of "intervening, unexpected, and unforeseen event[s]" leading to any injury. (Northfield Reply at 4.) Conway counters that although the complaint in the underlying action contains some allegations of intentional conduct, the complaint also alleges that Conway's negligent conduct caused the alleged harm. (Conway Reply at 6.) Thus, Conway argues, the underlying action involves a potential claim for loss of use of tangible assets caused by an "occurrence." (*Id.*)

The Court finds Conway's arguments persuasive. The complaint in the underlying action alleges that Conway failed to instruct her contractor to attempt to work outside restaurant hours, which significantly interfered with operation of the restaurant. (Compl. ¶ 13.) Although there is no dispute that Conway's *hiring* of the contractors was intentional (Conway Reply at 6), her alleged *failure to instruct* may have been merely negligent, and therefore, accidental. Indeed, the California Supreme Court has held that the term "accident," in the context of liability insurance, "is more comprehensive than the term 'negligence' and thus includes negligence." *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal. 5th 216, 221 (2018) (quoting *Safeco Ins. Co. v. Robert S.*, 26 Cal.4th 758, 765 (2001)). Accordingly, a policy providing coverage for injury caused by an "accident" "promise[s] coverage for liability resulting from the *insured's negligent acts.*" *Id.* (quoting *Safeco Ins*, 26 Cal.4th at 765) (emphasis in original).[4] Here, a finder

---

[4] The cases cited by Northfield do not warrant a different result. *Uhrich v. State Farm Fire & Cas. Co.*, 109 Cal. App. 4th 598, 611 (2003) stands for the proposition that an insured may

of fact could plausibly conclude that Conway's negligence was the starting point in a series of events leading to the loss of use of the restaurant assets. *See id.* (finding that employee's intentional conduct did not preclude potential coverage where underlying action alleged negligent hiring, retention, and supervision of employee).[5]

Accordingly, the Court finds that the underlying action includes a potential claim for loss of use of tangible property caused by an "occurrence" as defined in the Policies.

### 3. *Property Damage During the Policy Periods*

Next, the Court must determine whether the alleged "occurrence" that led to the "loss of use of tangible property" took place during the effective period of the Policies, namely August 26, 2016 to August 26, 2018. Northfield contends that insofar as Supmitchotima seeks damages for any loss of use of tangible property arising from the negligent scheduling of repairs, "Conway's instructions to her contractor had to have occurred at the time the work began, or before." (Northfield Reply at 5.) Conway counters that the underlying action involves allegations of ongoing and discrete actions undertaken by Conway starting in spring of 2016 up until the restaurant closed in 2018. (Conway Reply 6-7.)

Northfield's argument misconstrues the nature of the "occurrence" at issue, and accordingly, the timing of that "occurrence." The underlying action raises a potential claim for loss of use of tangible property arising from Conway's failure to instruct the contractor, not her affirmative instructions to the contractor. Thus, Conway's failure to instruct plausibly "occurred"

---

not invoke coverage simply by using the label "negligence" in the complaint. Here, Supmitchotima has not merely pleaded negligence, but has alleged facts that raise a potential claim based on Conway's unintentional conduct. In *American International Bank v. Fidelity & Deposit Co*., 49 Cal. App. 4th 1558, 1572 (1996), the court of appeal found no duty to defend because the plaintiff's negligence cause of action was based on alleged misrepresentations, which were not accidental. Likewise, in *Quan v. Truck Ins. Exchange*, 67 Cal. App. 4th 583, 600-01 (1998), the court of appeal found "no theory available on the facts expressed in the complaint . . . under which the insured can be liable for physical injuries caused by 'accidental' touching[.]"

[5] Conway also identifies the posting of construction parking notices as an "occurrence." (Conway Reply at 10.) The Court disagrees. The posting of the notices was a deliberate act by Conway, and there is no evidence of accidental acts in the sequence of events leading from the posting of the notices to the closure of the restaurant. Thus, the posting of the construction notices at inappropriate times does not constitute an "occurrence."

for as long as the contractors conducted repair work during restaurant hours.  Said another way, the negligent scheduling of repairs did not *necessarily* occur prior to the contractor beginning repairs on the property.

As to the timing of the repairs, although Supmitchotima alleges that the repair work caused her to close her restaurant in the spring of 2016, prior to the date the first policy took effect, the complaint also alleges that the contractors performed repairs in 2016 generally, which forced Supmitchotima to close the restaurant "at times."  (Compl. ¶¶ 13, 16, 29.)  Thus, there is at least a possibility that Conway's negligence as to the scheduling of repairs took place after August 26, 2016.  Likewise, the complaint plausibly alleges that closure of the restaurant in February 2018 relates back to "occurrences" that may have taken place after August 26, 2016.  (Compl. ¶ 19.)

In sum, the allegations from the underlying action raise a potential claim for "loss of use of tangible property" caused by an "occurrence" that took place during the policy periods, so as to trigger Northfield's duty to defend under Coverage A.

### B.  Personal and Advertising Injury: Wrongful Eviction, Wrongful Entry, or Invasion of the Right of Private Occupancy (Coverage B)

The Court next considers whether the underlying action implicates potential coverage under the "personal and advertising injury" provision of the Policies.  (JA, Ex. D at 25; JA, Ex. E at 25.)  The Policies define "personal and advertising injury" as any injury caused by one of several "offenses," including "[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, provided that the wrongful eviction, wrongful entry or invasion of the right of private occupancy is committed by or on behalf of the owner, landlord or lessor of that room, dwelling or premises."  (JA, Ex. D at 34; JA, Ex. E at 34.)

The parties agree that only the claims of a *natural person*, and not of a corporation, can trigger coverage for "personal and advertising injury."  (Northfield Reply at 8.)  Thus, as a threshold matter, the Court must determine whether the claims in the underlying action belong to Supmitchotima or to Pad Thai Restaurant, Inc.  Northfield contends that any claims for "personal and advertising injury" involve the commercial space and therefore belong to the corporation Pad

13

1    Thai Restaurant, Inc. (*Id*. at 17.) Conway counters that the underlying action does not

2    differentiate between claims belonging to Supmitchotima and to the corporation, and therefore,

3    Supmitchotima may recover for "personal and advertising injury." (Conway Reply at 8-9.)

4        The complaint alleges an action brought by Supmitchotima, "individually and doing

5    business as Pad Thai Restaurant, Inc." (Compl. ¶ 1.) The complaint contains numerous

6    allegations regarding injuries suffered by Supmitchotima herself. Indeed, insofar as the complaint

7    may allege harm to the restaurant as a corporation, such allegations are inextricably intertwined

8    with allegations of harm to Supmitchotima. For example, the complaint alleges that

9    **Supmitchotima** suffered severe emotional distress due to Conway's "failure to properly maintain

10   the building to permit the efficient operation of the [] restaurant." (Compl. ¶ 20.) The natural

11   reading of such allegations is that the underlying action involves a potential claim for "personal

12   and advertising injury" as to Supmitchotima, as a natural person, occupying and operating a

13   restaurant on the commercial premises.

14       Given that the underlying action raises claims brought by a natural person, the Court next

15   considers whether the claims implicate one of the three bases for "personal and advertising

16   injury": wrongful eviction, wrongful entry, or invasion of the right of private occupancy.

17   "[U]nder California law, the language 'wrongful entry or eviction, or other invasion of the right of

18   private occupancy' is limited to tort claims relating to the invasion of an interest in real

19   property." *Martin Marietta Corp. v. Insurance Co. of North America,* 40 Cal.App.4th 1113, 1125

20   (1995). As to wrongful eviction, such eviction is "actual" when "a landlord takes direct action to

21   physically expel the tenant from the premises." *Cunningham v. Universal Underwriters,* 98

22   Cal.App.4th 1141, 1152 (2002). "A constructive eviction occurs when the acts or omissions to act

23   of a landlord, or any disturbance or interference with the tenant's possession by the landlord,

24   renders the premises, or a substantial portion thereof, unfit for the purposes for which they were

25   leased, or which has the effect of depriving the tenant for a substantial period of time of the

26   beneficial, enjoyment or use of the premises." *Groh v. Kover's Bull Pen, Inc.*, 221 Cal. App. 2d

27   611, 639 (Ct. App. 1963). Wrongful entry "includes trespass claims, even if those claims do not

28   involve an intent to dispossess." *Martin Marietta*, 40 Cal. App. 4th at 1125. Further, the

California courts of appeal have recognized that the phrase "other invasion of the right of private occupancy" is ambiguous" but "resembles the definition of nuisance," that is, "an interference with the interest in the private use and enjoyment of the land." *Id.* at 1134.

The parties agree that the underlying action does not include a potential claim for actual eviction. Conway argues that Northfield nevertheless has a duty to defend because the underlying action involves potential claims for constructive eviction, wrongful entry, and invasion of the right of private occupancy. (Conway Motion at 17.) Northfield counters that no potential claim for eviction exists because Supmitchotima did not vacate the commercial premises, nor are there any allegations to establish a potential claim for wrongful entry or invasion of the right of private occupancy. At most, argues Northfield, the complaint alleges a "threatened eviction." (Dkt. No. 19 ("Northfield Cross-Motion") at 19.)

Northfield's argument fails to persuade. The lease for the 3295 Mission Street property expressly provides that the premises "shall be used for the exclusive purpose of operating and conducting a [r]estaurant and for uses normally incident to that purpose." (JA, Compl., Ex. A, at 4.) The complaint in the underlying action alleges that Supmitchotima was rendered unable to use a substantial portion of the property—namely, the entire first floor of the premises—for the purpose stated in the lease, primarily as a result of Conway failing to schedule repair work outside of business hours. (Conway Motion at 18.) Such allegations establish that the underlying action involves a potential claim for partial constructive eviction. *See Buckner v. Azulai*, 251 Cal. App. 2d Supp. 1013, 1015 (App. Dep't Super Ct. 1967) ("Conditions allowed to exist in a portion of the building other than the demised premises may cause a constructive eviction."); *Veysey v. Moriyama*, 184 Cal. 802, 805-806 (1921) (finding that "failure of the water supply on ten out of four hundred and sixty shares of water stock on a total acreage of six hundred and forty acres is sufficient to constitute a constructive eviction"). Moreover, the Court finds that the underlying action involves potential claims for wrongful entry and invasion of the right of private occupancy due to the nuisance of Conway's contractors allegedly working during restaurant hours.

Accordingly, the undisputed evidence demonstrates that the underlying action raises a potential claim for "personal or advertising injury" under the Policies, which triggers a duty to defend under Coverage B.

**C.      Exclusions from Coverage**

Although the underlying action raises potential claims for "property damage" and "personal and advertising injury," Northfield does not owe a duty to defend if exclusions in the Policies eliminate any potential for coverage. To demonstrate that an exclusion eliminates the duty to defend, an insurer must provide "conclusive evidence [proving] that the exclusion applies in all possible worlds." *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1039 (2002). Northfield claims four exclusions apply: "habitability," "independent contractor," "contractor damage," and "owned property."[6] The Court evaluates each.

*1.      The Habitability Exclusion*

The "habitability" exclusion precludes coverage for claims of "property damage" or "personal and advertising injury" where two criteria exist. First, the "property damage" or "personal or advertising injury" alleged must "[a]ris[e] out of" one of the following:

> (a) actual or alleged violation of any federal, state or local law, code, regulation, ordinance or rule relating to the habitability of any premises; (b) breach of any lease, rental agreement, warranty or covenant to maintain a premises in a habitable condition; or (c) wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling or premises, whether actual or constructive, due to failure to maintain a premises in a habitable condition.

(JA, Ex. D at 68; JA, Ex. E at 68.) Second, the "property damage" or "personal or advertising injury" must be "[a]lleged in any claim or 'suit' that also alleges any violation, breach or wrongful eviction, entry or invasion" as set forth in (a) through (c) above. (*Id.*)

The parties offer numerous authorities defining the term "habitability." Conway points to *Green v. Superior Court of San Francisco*, 10 Cal. 3d 616, 637 (1974), in which the California Supreme Court found that the "implied warranty of habitability does not require that a landlord

---

[6] The parties refer to the "contractor damage" and "owned property" provisions as exclusions, and accordingly, the Court analyzes them as such. However, the Court notes that these provisions are limitations on the definition of "property damage" and do not appear in the "exclusions" section of the Policies. (JA, Ex. D at 24; JA, Ex. E at 24.)

16

ensure that leased premises are in perfect, aesthetically pleasing condition, but it does mean that 'bare living requirements' must be maintained." (Conway Motion at 19-20.) Northfield cites various dictionaries defining habitable as "suitable to live in" and "providing a minimal level of safety and comfort so as to make for passable living conditions." (Northfield Cross-Motion at 22; *see also* Dkt. No. 19-2, Ex. 4.)

The Court finds these authorities generally consistent with one another, and moreover, that under any one of them, the underlying action implicates habitability issues. Importantly, the parties agree that any habitability issues in the underlying action relate to the residential premises **only**. Specifically, the issues include power outages, lack of proper ventilation, mold, inadequate electrical wiring, and "numerous safety hazards and deficiencies" in the residential premises. (Compl. ¶ 52.) Lack of access to proper ventilation and exposure to mold, to the degree alleged in the complaint, go beyond being merely unpleasant or aesthetically unsatisfying. Rather, these conditions made the premises unsafe, so much so that Conway allegedly told Supmitchotima that she and her family should move out of the building. (*Id.* ¶ 16.)

Further, Conway contends that because Supmitchotima did not vacate the residential premises, "her complaints about the property must be viewed as something less than allegations of failure to maintain 'bare living requirements'." (Conway Reply at 10.) The Court disagrees. A tenant may continue to inhabit an uninhabitable residence for many reasons. *See Green*, 10 Cal. 3d at 635 ("If the tenant can prove [] a breach [of the warranty of habitability] by the landlord, he may demonstrate that his nonpayment of rent was justified and that no rent is in fact 'due and owing' to the landlord. Under such circumstances, of course, the landlord would not be entitled to possession of the premises.")[7] It does not follow from Supmitchotima's occupancy of the

---

[7] Northfield argues that Conway's alleged failure to obtain a certificate of occupancy from the San Francisco Building Department permitting use of the premises as a residence also raises an issue of habitability. (Northfield Cross-Motion at 20.) Conway counters that Supmitchotima's allegations with respect to zoning do not mention habitability issues. (Conway Motion at 20.) The Court is not convinced that Conway's alleged failure to obtain the proper residential permits is wholly unrelated to the habitability of the residential premises. However, as described, the complaint alleges numerous other issues regarding habitability. Thus, the Court need not decide on this alternative theory.

residential premises that the premises was habitable. To the contrary, the Court finds the complaint includes a potential claim that the residential premises was uninhabitable.

Given that the underlying action raises habitability claims as to the *residential* premises, the Court must determine whether the "habitability" exclusion precludes coverage for a potential claim related to the *commercial* premises. Northfield argues that it does, urging the Court to interpret the exclusion as precluding coverage for *any* claim in a lawsuit where even one claim concerns habitability. (Northfield Reply at 9.)

The Court is not persuaded. The express language of the "habitability" exclusion requires that the "property damage" or "personal and advertising injury" claim in the underlying action "[a]ris[e] out of" a habitability issue. Here, any potential claim for "property damage" or "personal and advertising injury" does not arise out of habitability issues because such claims relate to the commercial premises only. Moreover, to the extent the "habitability" provision may be ambiguous, any ambiguity must be construed against Northfield. *See Nat'l Union Fire Ins. Co. v. Lynette C.*, 228 Cal. App. 3d 1073, 1077 (Ct. App. 1991) (holding that exclusion provisions in insurance contracts "are construed strictly against the insurer"). The mere fact that a habitability issue may exist in a complaint is insufficient to satisfy the exclusion. As such, the Court finds that the "habitability" exclusion does not preclude coverage for a potential claim of "property damage" or "personal and advertising injury."

### 2. The Independent Contractors Exclusion

Next, the Court considers whether the "independent contractors" exclusion precludes coverage for any potential "property damage" or "personal and advertising injury" claim.[8] With respect to this exclusion, coverage does not extend where the claim "aris[es] out of" the operations of any independent contractor performed for or on behalf of any insured." (JA, Ex. D at 42; JA, Ex. E at 42.) The Policies define "independent contractors" as any person who is not the insured's

_____

[8] Northfield argues that the "independent contractors" exclusion would preclude coverage for any purported "property damage" but does not address its application to a potential claim for "personal and advertising injury." (Northfield Motion at 16.) The Court finds that the exclusion, by its express terms, may apply to both forms of coverage. (JA, Ex. D at 42; JA, Ex. E at 42.) Thus, the Court considers the applicability of the exclusion to a potential claim for "property damage" *or* "personal and advertising injury."

"employee," "temporary worker," or "volunteer worker," but who performs duties related to the conduct of the insured's business because of a contract or agreement between the insured and that person for specified services. (JA, Ex. D at 52; JA, Ex. E at 52.) "Employee" includes individuals provided by a "labor leasing firm under an agreement . . . to perform duties related to the conduct of [the insured's] business," but it excludes individuals "furnished . . . to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." (JA, Ex. D at 32, 35; JA, Ex. E at 32, 35.)

The parties dispute whether the contractor who performed repairs on the property qualifies as an "independent contractor" under the Policies. The Court finds that it need not resolve this issue, however, because even assuming these individuals were "independent contractors," the exclusion does not apply because not all potential claims arise out of work performed by the contractors. Rather, as explained above, the underlying action alleges potential claims for "property damage" and "personal and advertising injury" arising out of *Conway's* failure to instruct her contractors to work outside of restaurant hours and posting of construction parking notices at unnecessary times. Even if the contractors' repair work was a necessary factor in the causal chain leading to closure of the restaurant, the gravamen of the complaint is that Conway's conduct caused the harm alleged. Thus, the Court finds that Northfield has not demonstrated that the "independent contractors" exclusion eliminated the duty to defend in "all possible worlds." *Atlantic Mutual*, 100 Cal.App.4th at 1039.

### 3. Contractor Damage

Under the "contractor damage" exclusion, coverage does not extend to claims of "property damage" to "[t]hat particular part of real property on which [the insured] or any contractors or subcontractors working . . . on [the insured's] behalf are performing operations." (JA, Ex. D at 24; JA, Ex. E at 24.)

Here, any potential claim for "property damage" applies to Supmitchotima's loss of use of restaurant assets, rather than the restaurant premises. There are no allegations in the complaint suggesting that the contractors performed repairs on Supmitchotima's assets, and even if there were, the underlying action raises a potential claim for loss of use of property owned by

Supmichotima on which the contractors did not perform repairs.  Thus, the "contractor damage" exclusion does not bar coverage.

### 4.  Owned Property

The "owned property" exclusion bars coverage for claims of "property damage" where the alleged damage was to "property [the insured] own[s], rent[s], or occup[ies]."  (JA, Ex. D at 24; JA, Ex. E at 24.)  In other words, coverage does not apply to "loss of use of tangible property" owned by Conway.

Conway contends, and Northfield does not dispute, that insofar as the underlying action raises a potential claim for loss of use of restaurant assets owned by Supmitchotima, the "owned property" exclusion does not apply.  (Conway Reply at 7; Northfield Reply at 6.)  Thus, because the Court finds that a potential claim for "loss of use of tangible property" concerns Supmitchotima's restaurant assets, the "owned property" exclusion does not preclude coverage.

In sum, the Court finds that none of the exclusions in the Policies bar coverage for potential claims under Coverage A or Coverage B.  Accordingly, Northfield has a duty to defend.

### D.  Breach of the Covenant of Good Faith and Fair Dealing

Finally, the Court must consider whether Northfield is entitled to summary judgment on Conway's claim for breach of the covenant of good faith and fair dealing.  Conway alleges that Northfield breached the covenant of good faith and fair dealing by failing to conduct a reasonable investigation into the underlying action.  (Dkt. No. 1-1, ¶¶ 32-35.)  Northfield contends that it is entitled to summary judgment on this claim because Conway has not established a potential for coverage.  (Northfield Cross-Motion at 23.)[9]

As explained above, the Court finds that Northfield has a duty to defend Conway in the underlying action.  Accordingly, Northfield is not entitled to summary judgment on this claim.

---

[9]  In her motion, Conway moves for partial summary judgment as to the part of the claims alleged in the underlying action relating to Northfield's duty to defend.  Conway does not address the good faith and fair dealing claim in her motion or in her reply in support of her motion. Accordingly, the Court considers only whether Northfield is entitled to summary judgment as to this claim.

**IV.** **CONCLUSION**

Because Conway has established by undisputed evidence that a potential for coverage exists, the Court finds as a matter of law that Northfield has a duty to defend Conway, and accordingly, it is not entitled to summary judgment on Conway's claim for breach of the covenant of good faith and fair dealing. Therefore, Conway's motion for partial summary judgment is **GRANTED** and Northfield's cross-motion for summary judgment is **DENIED**.

Within **five business days** of this Order, Conway shall submit a proposed form of judgment, approved as to form by Northfield.

This terminates Dkt. Nos. 18 and 19.

**IT IS SO ORDERED.**

Dated: July 16, 2019

_____

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**